Curia, per Woodworth, J.
This was an action for tro *182 ver to recover the amount of a promissory note drawn by Luther Marsh in favor of the plaintiff for $435, and alleged to have been converted by the defendant.
The plea avers, that after the closing of the polls at the election in 1826, and before the event was known, the plaintiff and Marsh made a bet upon the event of the election for governor, they being legal voters ; that the note was deposited by Marsh with the defendant, as stakeholder, upon condition that if De Witt Clinton had been elected governor at the election, the note was to be delivered to the plaintiff; that afterwards, and before the event of the election was generally known, and before the official canvass of the election in the respective counties of the state, Marsh forbade the defendant to deliver over the note to the plaintiff, and demanded that it should be delivered to him, and that in pursuance of such demand, he re-delivered the note to Marsh To this plea there is a demurrer.
From the plea, I infer that Marsh, before the demand of his note from the stakeholder, was well satisfied as to the result of the election. The averment is that it was not generally known. Want of knowledge in Marsh is not pretended. This, then, is not the case of a party, who, having made an illegal wager, and deposited the amount with the stakeholder, attempts to avail hihiself of a locus penitentice, (before the event is known, and before there are any reasonable grounds for forming an opinion of the result,) and claims his deposit. It is not necessary here to say whether such a claim could be enforced against the stakeholder, should he refuse to comply; neither is it necessary to give any opinion on the question whether Marsh could, in this case, have sustained an action against the stakeholder, had he refused to deliver up the note.
The question here is between the winner and the stakeholder. The event has taken place; and the stakeholder is entitled to defend himself on the same ground that might be taken by the losing party had the action been against him. Is a wager of this kind recoverable ? It is conceded that some wagers form the proper ground of an action, although *eourts have generally expressed regret that the *183 law has so been settled in any case. There are wagers of a different class, which cannot be supported, and among that number may be reckoned such as are contrary to the principles of morality or sound policy. (Jones v. Randall, and Da Costa v. Jones, Cowper, 37, 729.)
The wager in this case falls within the latter description; for, although it does not possess one prominent feature which distinguished the case of Bunn v. Riker, (4 John. 425,) (I allude to the fact that the bet was laid on the last day of the election, and one of the parties had not then voted,) yet enough remains which the principles of sound policy forbid the court to sanction.
The wager is, that De Witt Clinton had been elected governor. By the act regulating elections, (sess. 45, ch. 250,) it is declared, that all questions that may arise in the canvass, estimate or calculation of the votes given at any election, shall be decided by the opinion of the majority of persons composing the board, who shall determine conform-ably to the the certified copies returned by the clerks of counties, the person duly elected, and cause to be delivered a certificate of their determination.
If the question is afterwards to be litigated in a court of law, I apprehend the certificate would only be prima facie evidence, and that it would be competent to go into evidence to show that the canvass was not correct, or was illegal. Thus a jury may find 'that the governor declared to have been elected had not been duly elected; but that another person is the legal governor, by a majority of votes. Such decision would not affect the exercise of the powers of governor by the person holding the certificate; but its manifest tendency would be to excite discontents, and pos - sibly disturbances among the people; to alienate their attachment from an incumbent chosen by a minority, and withhold confidence so essentially necessary in a government resting on public opinion. We may suppose a case, where it is alleged that a certificate was obtained by bribery. The question being as to the validity of the election of the chief magistrate, evidence might be offered to prove the fact, and thus implicate third persons, not parties *to *184 the suit, who may or may not know that any such qnes tion is pending. We are, then, called on to decide, whether an idle wager, which might draw into discussion matters of great public interest, the direct tendency of whiph ■ is to open the door of collision between different departments of the government, to impair public confidence, and agitate the community, without producing any salutary effect, ought not to be considered as'against sound policy ? [1] *185 t have no difficulty m answering this question in the affirmative.
*186 The defendant is entitled to judgment on the demur, rer.
Judgment for the defendant (a.)

 Brush v. Keeler, 5 Wen. 250. Like v. Thompson, 9 Barb. 315. Morgan v. Groff, 4 Barb. 525. 2 New York R. S. 4th ed. 72, § 8, 9, declare all wagers, bets or stakes, made to depend on any race, or upon any gaming, by lot or chance, or upon any lot, chance, casuality, or unknown or contingent event, to be unlawful. And that all contracts for, or on account of any money, or property, or thing in action so wagered, bet, or staked, shall be void. And that any person who shall pay, deliver or deposite any money, property or thing in action, upon the event of any wager or bet herein prohibited, may sue for, and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or any other person in whose hands shall he deposited any such wager, stake or bet, or any part thereof, whether the same shall be paid over by such stakeholder or not, and whether any such wager be lost or not, See also Lewis v. Miner, 3 Denio, 103. Buckman v. Pitcher, 1 Comst. 392. In this last case the plaintiff recovered from the stakeholder, after the stakeholder had paid over the bet to the winner by the direction of the plaintiff; and the court further held, that an action to recover the same might be brought without a prior demand. But money, knowingly lent to he used in betting, cannot be recovered from the borrower. Peek v. Briggs, 3 Denio, 107. Morgan v. Groff, 5 id. 364. Buckman v. Ryan, 5 id. 340. McKinnell v. Robinson, 3 M. & W. 434. Cannon v. Bryce, 3 B. & Aid. 179. Langton v. Hughes, 1 M. & S. 503. The Gas-Light and Coke Co. v. Turner, 5 Bing. N. C. 666. De Begnis v. Armstead, 10 Bing. Rep, 107. Rut money paid on illegal contract may be recovered back while the contract is executory, but not if it is executed. Morgan v. Groff, 4 Barb. S. C, Rep. 524. Like v. Thompson, 9 Barb. 315.
In the first the plaintiff sent money to the defendant, with directions to bet it on the event of an election, with a particular person; instead of doing so, the defendant used the money in betting with another person, and lost it. The court therefore held, that the contract was not executed, and that the plaintiff could recover, although the defendant had paid the sum lent him, by the plaintiff, to the winners. For it is a general rule, that as long as money deposited with an agent for an illegal purpose is unemployed; or if the purpose he countermanded by the principal before its application, it is a debt which may be recovered from the agent by the principal, either at law or equity. Taylor v. Lendie, 9 East, 49. 13 Ves. 313. 2 Black. Com. 467. Lenant v. Elliot, 1 Bos, & Pul. 3. Farmer v. Russell, 2 id. 296. Paley’s Agency, Dunlop, ed. 62, § 8. Morgan v. Groff, supra.
*185 In the case of Briggs «. Peck, one Smith Tompkins and Peck, borrowed money from Briggs, to bet on an election with Peck, which sum was deposited in the hands of Briggs the lender, as stakeholder. Tompkins lost the bet, and Briggs paid the money to Peck, who agreed to refund it in case Tompkins, the borrower, would not repay Briggs, and also to indemnify Briggs in case he sued Tompkins for the loan and could not recover. Tompkins refused to pay, and Briggs sued him, and failed: whereupon he sued Peck for the amount of the stakes, together with the costs of the former suit, and recovered. Bbonson, Ch. J., said, “ It will be proper to notice the rights of the parties as they stood before the money was paid over. And in the first place, although the defendant had won the wager, he had no legal title to the money. If paid to him it might be recovered back. The plaintiff could not recover from Tompkins the money, as it was loaned for an unlawful purpose. But Tompkins could not recover the money from them, because he had not in fact paid it. The plaintiff therefore was safe. The amount they borrowed from Briggs was in his hands as stakeholder, and no one could recover it from him. In this state of things, Peck applied for, and received the money, on the promise to refund it in case Tompkins should not approve the payment. And when Tompkins refused to ratify the payment, the defendant requested the plaintiff to sue Tompkins for the sum he had borrowed, and promised to repay the money in case the suit failed; and also to indemnify the plaintiff against the costs and expenses of the litigation. The promise was based on a sufficient consideration. This promise to refund the money, did not contravene either the letter or spirit of the gaming act.” Peclcv. Briggs, 3 Denio, 107, 109. “It is well here to observe that the laws of maintenance, beyond a prohibition against- taking a conveyance of land in suit, buying and selling pretended titles, and conspiracies falsely to move or maintain suits, are abolished in this state by statute.” id.
Although the losing party may recover back a wager after the event is known, either from the winner or stakeholder, yet where the stake was a chattel, which the loser retained in his possession, and when the event was determined against him, purchased it of the winner and paid him for it in money, and then sued him for it in trover, treating the sale as a conversion by the defendant, held that he could not recover.
Qtiere. If the suit had been for money paid on a purchase, could it be sustained? Lewis v. Miner, 3 Denio, 103.
A plaintiff seeking to recover a bet, should declare under the statute. See Like v. Thompson, 9 Barb. 313.
So under § 10 of the Constitution of the State of New York, and 5 22 R. S. t! raffling and lotteries are illegal,” although works of art, which are to be distributed by chance, to any person who, before distribution, shall have paid his money for the chance of obtaining such distribution. The People v. The American Art Union, 13 Barb. 577.

) In M’AIlister v. Hoffman, (16 Serg. & Bawle’s B. 147,) it was decided that money bet upon an election, and deposited with a stakeholder, who after the event of the election is known, has notice not to pay it over to the winner, but disobeys the notice, may be recovered back from the winner. It seems, by that case, that there is a statute of Pennsylvania, forbidding wagers on elections, under a penalty.
We are indebted for the following remarks on the validity of wagers generally, and bets on the event of an election particularly, and the decision of the supreme judicial court of Bhode Island on the latter subject, to the “United States Law Intelligencer, and Beview,” for Feb. 1829, a monthly publication of sterling worth, conducted by Mr. Joseph IC. Angelí, (Providence, B. I.) well known as the author of several volumes on some interesting branches of our law. This periodical throughout will richly compensate any lawyer for the expense and labor of procuring and studying it; and I feel myself justified in my extract, were it only with a view to bring before the profession and urge upon their attention the strong moral objections which it enforces against a disgraceful species of gambling. I feel no doubt that the bar of New York will fully concur with Mr. Angelí on this head : and they will permit me to say, it depends much on them, whether we shall be favored (like the state of Pennsylvania) by a penal statute calculated to do away the greatest mischief which can befall the elective franchise. On this question, I refer them also, particularly, to the reasoning of C. J. Eddy, given in Mr. Angelí1 s article, and that of President Bush, which I subjoin to the article quoted.
VALIDITY OF WAGEBS AND BETS ON THE EVENT OF AN ELECTION.
The cases which have been adjudged in England in relation to bets or wagers do not, it seems, in general, prohibit this species of contract; and if a wager is made on indifferent subjects or questions (however trivial) it has been considered valid, and that an action thereon maybe maintained against the loser. This was established in Good v. Elliott, (3 T. B. 693,) where the subject of the wager was, whether one S. T. had, or had not, before a certain day *bought a wagón belonging to D. C.; which wager three judges, contrary to the opinion of Buller J., held to be good. So it has been held in England, that a wager on the ages of plaintiff and defendant is legal. (3 Campb. 168.) The courts, however, both in England and in this country, have frequently reprehended these contracts, and expressed their regret that they have ever been sanctioned. And it has been expressly decided in England that a wager made upon the life of Bonaparte, was void. (Gilbert v. Sikes, 16 East. 156.) And as late as the third ult., a wager on the escape of the same individual from St. Helena was adjudged void by the supreme court of Pennsyl *187 vania, though two of the judges dissented. The wager upon which the action was brought was evidenced by a writing in the following terms, which was signed by the parties : “ May 14th, 1821. This day Stephen Ives bet one hundred dollars, with John Phillips, that Napoleon Bonaparte will, at or before the expiration of two years from. the above date, be removed or escape from the island of St. Helena. It is understood between the parties, that if Bonaparte should die within the above period of two years, and on the island of St. Helena, that Mr. Ives loses the bet.”
Bonaparte did die on the island of St. Helena, within the two years, or was dead at the time. The following is the'opinion of the court :
“ Certainly a wager can generally be recovered in England, unless when betting on the particular subject is prohibited by act of Parliament. When we reflect that no good can result to the community from the practice of betting, that much loss and domestic distress is occasioned by it, no wonder that in that country, judges have regretted that it has been decided that a bet could be recovered. When our ancestors separated this country from England, on the 28th January, 1777, it was enacted that the common law of such of the statutes of England as have heretofore been in force in this province, shall be in force and binding until altered, &e. Now I have always believed that the restrictive words “ as have heretofore been ” are applicable to common law as to statute law. Much of both never was, and is not now, law here. And I would imitate those judges who decided that gaming policies of insurance, though good at common law, were void here, and not suitable to the principles or genius of our institutions. ■ In fact this is a gaming policy, but as I view this case, there is another principle on which the judgment of the court is right, admitting that some wagers can be recovered. But in this I do not give the opinion of the court, who think the legislature only can prohibit a recovery in all cases of wagers. No man or men have any right to occasion trouble or uneasiness to any other man or woman, and no court ought to assist them in so doing, or permit its jurisdiction to be abused, for such purpose. It has been decided that certain wagers, whether a particular person was a man or a woman, were not recoverable in a court of justice, because the proof might be indecent, and the investigation distressing to the person, although the testimony may not, in all cases, lead to inquiries or call for proof which is indecent, and although the investigation may, in some possible cases, not occasion distress to the person who is the subject of the bet. Yet the very same bet, and the evidence to be adduced, may be very distressing to another person, about whom the second bet maybe made.
A man of undoubted wealth, not in debt, and not surety for any person, may feel perfectly indifferent as to an investigation in a court of justice as to the precise amount of that wealth; but a man in other circumstances may be ♦much distressed and seriously injured. I may be perfectly indifferent as to a bet on my age, but there are no doubt many persons about whose age it would be impertinent to bet, and who would be much hurt by the investigation. Ordinarily, a man in prison for any cause is enough distressed. Shall it be permitted, that the question, when he will be liberated, shall be a subject of wagers among idle, or thoughtless, or malicious persons ? And shall the courts of justice of the country add to that distress, by listening to, and *188 collecting others to listen to, aU that malice or avarice may be able to collect on the subject ? I would consider it as a case calling for a general rule, and say, that as every bet about the age, or height, or weight, or wealth, or circumstances and situation of any person are either malicious or indecent, or impertinent or indelicate, all such bets are illegal, and that no court ougjit, in any case, to sustain a suit on such a wager : and this, whether the subject of the bet was man, or woman, or child, married or single, native or foreign, in this country or abroad. I can perceive no principle of law or justice, which will require or permit the time of the country and its courts to be wasted, to gratify the malice or curiosity, or the caprice of the unthinking and impertinent. There are many things which politeness would not mention, and charity would conceal, and would not assist folly or malignity in making them public. I would not as a man, and I will not as a judge. I hold no bet of any kind, about any human being, recoverable in a court of justice. And as the majority of the court is of’this opinion, it is unnecessary to notice the other points discussed.”
It would certainly be gratifying if the courts of this country could consistently establish the doctrine with regard to wagers which prevails in Scotland, which is, that all wagers are invalid, on the sound principle, that courts of law were instituted solely for the protection of real rights, and for the enforcement of serious contracts. One rule, however, is well settled both'here and in England, and that is, if a wager is contrary to public morals* or policy, it is void. Whether this rule extends to a wager made on the event of an election, has, it appears in several oases, been a question for the court to determine. In the ease of Allen v. Hearn, (1 T. R. 56,) which was an action of assumpsit before Lord Mansfield, to recover one hundred pounds on a wager made between the plaintiff and defendant, who were both voters, on the event of an election of a member to serve in Parliament; his lordship was of opinion, that the right of the plaintiff to recover, depended upon the question as to the nature and species of the contract; and that if the contract was in the eye of the law corrupt, it could not be supported. One of the principal foundations of the constitution, he reasoned, depended on the proper exercise of the elective franchise, that the election of members of Parliament should be free, and particularly that every voter should be free from pecuniary influence in giving his vote. The wager, he thought, laid both parties under a pecuniary influence, and made each of them in the nature of a candidate. And he inquired, what was so easy, in a case where a bribe is intended, as to lay a wager ? and remarked upon the difficulty of proving that a wager made a pariy give a contrary vote to what he would have done otherwise. As the wager, he continued to reason, had an influence on the mind of the pariy, it was a color for bribery, and hence was void.
*In the above case, it will be observed, the parties who made the wager, ' were both voters, and it seems to have been on that ground that the contract was adjudged void. But it is certainly very desirable under a government like ours, where elections are so frequent, to prevent as far as possible every
♦In an action very recently brought on a wrestling bet before the King’s Bench, Lord Tenderden said, it was an action he could not try. *189 species of undue influence, and to discountenance all electioneering for private ends. All Wagers, therefore, made upon the event of an election, without any exception, should, when considered in reference to their results, in a political and moral point of view, unquestionably he denounced. In a case which recently came before the supreme judicial court of Rhode Island, the action was to recover the amount of a wager made between plaintiff and defendant—that the Hon. Asher Robins would he elected a senator to congress at the next ensuing senatorial election, at which the choice was to he made by the legislature. Both plaintiff and defendant were inhabitants and citizens of the state, but neither of them members of the legislature. Mr. C. J. Eddy, gave his opinion as follows :
“ It is admitted that, by the common law, some wagers are legal, and may he enforced in a court of justice. This admission is made with regret in many of the modem decisions; and Were the question res integra, there is little doubt that all wagers would now he declared illegal. Among wagers deemed illegal, are those against sound policy, or of immoral tendency, which may affect the feelings, interest or character of a third party, or tend to disturb the peace of society.
“In the case of Gilbert and Sikes, (16 East, 156,) an action on a wager on the life of Bonaparte, Lord Ellenborough says :—1 Wherever the tolerating any species of contract, has a tendency to produce a public mischief or inconvenience, such a contract has been held void.’ And after, in nearly the same words, ‘ if a contract have a tendency to a mischievous and pernicious consequence, it is void.’ And again, ‘where the subject matter of the wager has a tendency injurious to the interests of mankind, I have no doubt in saying that it ought not to be sustained.’ In the same case, Le Blanc, J. Bays, ‘ It has often, been lamented, that actions upon idle wagers should ever have been maintained in courts of justice. The practice seems to have prevailed before that full consideration of the subject which has been had in modem times.’ ‘ And it is now clearly settled, that the subject matter of a wager must at least be perfectly innocent in itself, and must not tend to immorality or impolicy.’ In the same case, Baily, J. speaking of the wager then under consideration, says. ‘ It gives to one person a pecuniary interest in the violent death of another, by whatever means procured.’ ‘ Shall it he allowed to a subject to say, (says Lord Ellenborough in the same case) toat the moral duties which bind man to man are in no hazard of being neglected when put in competition with individual interest ?’
“ If we apply these principles to the question before us, there can be little doubt what the decision ought to he. The wager was on the election of a certain person, by the general assembly, to the office of Senator in congress. Did it not give to the plaintiff a pecuniary interest in the election of that person; and to the defendant an equal pecuniary interest in preventing that election ? And shall it be allowed to either party, or any one else to say, that in this case the moral duties which bind man to man, or to communities of men, were in no hazard of being neglected, when thus put in competition with individual interest ?’
* “ If a contract have a tendency to a mischievous consequence, it is void. What is the tendency of a wager, on an approaching election ? Is it to pro *190 duce peace, harmony, fair dealing ? Or is it not rather to produce clamor misrepresentation, abuse, discord; the exertion of improper influence; of intrigue, bargain, and corruption; of the use of means, by each party, fitted to the end, that is, the winning of the bet ? And is not this tendency greater, in proportion to the amount of the wager, and the influence of the parties to the wager ? To say that because the parties to a wager are not members of the legislature by whose vote the wager will be decided, therefore the wager can have no influence on the members of the legislature, is to say, that the power and influence of individuals out of the legislature, can in no case affect the vote of that legislature, however great the power and influence of those individuals may be; which is to say what is in itself absurd, what daily experience teaches to be false, and what a moment’s reflection must convince every one is not and cannot be true. If the tendency of the wager, in the case before us, be thus, then is that tendency immoral; for no one, it is believed, will so far hazard his own reputation for correct moral feeling, as to undertake to reconcile misrepresentation, slander, intrigue, or corruption, with the principles of morality. We might then safely say, it is contrary to sound policy, because immoral. But it is contrary to sound policy in a more important point of view. More important, because the immoral tendency, and pernicious bearing on our free institutions, is more extensive and injurious. The stronghold of freedom in our country is in the freedom of our elections. Destroy this, and our freedom is at an end. Whatever tends to this destruction in the remotest degree, ought to be resisted here, with a determination that admits of no compromise. Wagers on elections, whether by the people or the general assembly, have this tendency directly. And this tendency, in a given case, is in proportion to the interest at stake, and the influence of the parties to the wager. To say that a wager can have no influence in such a case, is to say, either that man has ceased to regard his own interest, or that interest has ceased to influence man’s conduct. This interest and influence may result in the grossest corruption. It is enough for the decision of this case to show, that a wager on an election has this tendency. Can it be necessary to ask, whether, in a free country, a contract which has a tendency to destroy freedom of elections, and produce corruption, is consistent with sound policy ? In Vischer v. Yates, (11 John. 31,) which was an action against a stakeholder of a bet on an election, Kent, C. J., in delivering the opinion of the court says : ‘We choose rather to place the decision of this case upon those great and solid principles of policy which forbid this species of gambling, as tending to debase the character, and to impair the value of the right of suffrage.’
“ There is one other point of view in which this case may be considered, and in which this wager will appear equally indefensible. If the feelings, interest, or character of a third party may be affected by a wager; or if it tend to disturb the peace of society, it cannot be sustained. (Da Costa v. Jones, Cowp. 729.) If the election in question had taken place by a majority of one vote, and that one vote had been procured by bribery, would the wager have been fairly won? And if not won, ought not the defendant to be permitted to show it, and avoid the payment ? But would a court of law inquire into a transaction, so full of interest and feeling to third parties, *191 •in order to decide an ’Idle wager?’ No; nor would it comport with sound policy to suffer such a question to be discussed in a court of law, on a mere wager, dependent on the feelings or interest of third parties. In the case of Da Costa v. Jones, Lord Mansfield, stating as a case, a wager that an unmarried woman has had a bastard, says, ’ Would you try that ? Would it be endured? Most unquestionably it would not; because it is not only an injury to the third person, but it disturbs the peace of society; and the party to be affected by it would have a right to say, how dare you bring my name in question ?’ With how much more propriety might the parties charged with corruption in the case above supposed, put the same question! And how much greater would be the tendency in that case to disturb the peace of society!
“ In the case of Bunn v. Biker, (4 John. 428,) which was a wager on the election of the governor of the state, Van Ness, J. says, * It may involve an inquiry into the validity of the election of the present chief magistrate.’ In answer to the objection that the certificate of the canvassers would be conclusive, he says, 1 It is enough that this wager may give birth to such a question, to pronounce it to be repugnant to the dictates of good policy. It is a discussion calculated to endanger the peace and tranquillity of a community.’ These principles are fully recognized in the case of Lansing v. Lansing, (8 John. 454,) which was a similar bet, made after the polls were closed. Say the court, 1 This case falls within the principle laid down in Bunn v. Biker, that a bet, involving an inquiry into the validity of the election of governor, was void, on principles of policy.’
“ With these principles, as well as those quoted from the other authorities, whether binding on this court as authorities or not, we fully concur, and have no hesitation in saying,' that all bets on elections, whether by the people or the general' assembly, and all bets on judicial decisions, are of immoral tendency, against sound policy, and ought not to be sustained, especially in this state, where all our officers, judicial as well as others, are of annual appointment.”
The following is the opinion of President Bush, in the cause referred to by Mr. J. A. Spencer, arguendo, in the principal case :
Bush, President. This is a wager on the election of a chiei magistrate, and if ever a wager deserved reprobation, it is one of this description. In the state of New York, it has been decided, after argument, that a wager ol this kind, whether laid before or after an election, cannot be recovered. Without adopting ¿11 the reasoning of the court in those r ases, we have no hesitation in saying we concur in both decisions.
Even in England they have guarded their elections from this new species of corruption, and have vacated all such contracts as are contrary to sound policy.
Popular suffrage is the very essence of freedom, and cannot be protected by tribunals of justice with too much vigilance and firmness. Those external impressions that have a tendency to disturb its orderly and regular motions should be discountenanced, as repugnant to the vital interest of our *192 country. To the usual motives that actuate Voters, it would b8 mdfistrous .£0 permjt: pecuniary considerations to be added. *
*The success of an election might eventually become a mattei of speculation and profit, like a horse race, rather than an acquisition to the freedom and happiness of the people. Where a man has actually voted, prw to his laying a wager on the election, he is not indifferent to the result, Though he himself cannot become a corrupt voter, he may be induced, Under the influence of the wager, to corrupt others.
What were the motives of Smyth & M’Masters, forms no part of the question. Is the contract injurious to the public welfare 7 In otir opinion, it is equally repugnant to morality, to sound policy and to the laws of the" state, passed for the avowed purpose, of preserving the purity of our public elections.
It would be in vain to enact laws against bribery, and to authorize, at the same time, wagers of this kind, which, like a torrent of corruption, would carry all before them.
Even if the bet had been laid between two persons, who were riot voters, which does not appear to have been the case, yet, as it might lead to a decision, by the judicial branch, on the validity of an election, and consequently, to the right of a member to a seat in the legislature, the point ought never to be brought into discussion. It is obvious that the legislative and judicial authorities might he put into a state of collision upon a question, which, it" is apprehended, the legislature alone is competent to determine. Upon a ease stated for the opinion of the court, they might give judgment, prior to the house of assembly deciding it, who might, perhaps, afterwards give a contrary decision. The most effectual way to avoid this is judtcally to pronounce, as they have done in New York, all wagers upon the result of elections to he illegal and void.
The constitution of our state declares that elections shall he free. The body of the voter shall be equally free from constraint, and his mind from insuperable bias. A wager that a certain person will be elected, puts the mind as completely into trammels as a state of duress puts the body of the voter. The mind cannot act freely, as long as the man is held in bondage to his mercenary views and engagements ; and, having divested himself of his own independence, he is a fit instrument of corruption to fasten the chains of slavery upon all around him. ,
It is the opinion of the court that the plaintiff cannot recover, and that judgment be entered for the defendant.
Judgment for the defendant.